JOYCE LYNETTE GOHL, APPELLEE AND CROSS-APPELLANT, V.
GERALD LEE GOHL, APPELLANT AND CROSS-APPELLEE.
700 N.W.2d 625

Filed July 5, 2005.    No. A-03-1102.

Michael E. Piccolo, of Dawson & Piccolo, for appellant.

Maurice A. Green, of Green Law Offices, P.C., for appellee.

INBODY, Chief Judge, and SIEVERS and CASSEL, Judges.

SIEVERS, Judge.

I. BACKGROUND

Joyce Lynette Gohl and Gerald Lee Gohl (Jerry) were married on July 25, 1969. At the time of the June 18, 2003, trial in this dissolution action, Joyce was employed as a business instructor

for the Wauneta Public Schools, having recently completed her first year of teaching. Jerry was involved with the company the parties founded, Golight, Inc., which grew from his idea for a portable rotating spotlight to become the manufacturer of such product and other lighting products which are manufactured overseas and marketed extensively, including by mail order.

Golight sued Wal-Mart Stores, Inc. (Wal-Mart), for infringement of Golight's patent—referred to in such litigation as the "989 patent"—for a portable rotating searchlight device that can be controlled by a wireless handheld device. As a result, on August 9, 2002, judgment was entered in the U.S. District Court for the District of Colorado in Golight's favor against Wal-Mart in the amount of $464,280 plus prejudgment and postjudgment interest. Additionally, the federal trial court made an award of attorney fees to Golight and set forth a procedure by which application for and proof of fees would be submitted to the court. If the federal court made an award of fees, it is not in our record. At the time of the divorce trial, the judgment against Wal-Mart was on appeal to the U.S. Court of Appeals for the Federal Circuit. Wayne Hildebrandt, the executive vice president of the Farmers State Bank in Maywood, Nebraska, testified that the bank has loaned Golight $400,000 for attorney fees for the patent litigation—out of a total amount loaned to Golight of $969,000. Hildebrandt testified that all of this debt was corporate debt and that Jerry had no personal loans with the bank, although he said Jerry was personally indebted to Golight in the amount of $160,000.

Golight is also the owner of a "bed and breakfast" at Johnson Lake, Nebraska, called the Waterfjord House, which, including purchase price, renovations, and furnishings, has involved the expenditure of over $700,000 by Golight.

Robert D. McChesney, a certified public accountant and "certified valuation analyst," offered his opinion on Jerry's behalf that the fair market value of Golight was $505,283 as of May 31, 2001. (We have rounded the financial figures to full dollar amounts throughout our opinion.) McChesney indicated that this was a weighted average using the adjusted net asset value of $447,381 and a capitalization of excess earnings value of $592,136, such values being weighted at 60 and 40 percent,

respectively. In contrast, Joyce offered an opinion of value from Dehn Renter, also a certified public accountant and certified valuation analyst, which put the valuation of Golight as of May 31, 2002, at $2,041,327.

Additionally, the marital estate includes Jerry's 25-percent interest in the Gohl Brothers partnership, which is involved in farming and oil leases in Hayes County, Nebraska. McChesney opined that the fair market value of Jerry's interest in Gohl Brothers was $383,614 as of May 31, 2001, and we treat that valuation as uncontested.

The parties each hold a bachelor of science degree in education. During the course of their marriage, a son and a daughter were born to them, both of which children are now well past the age of majority. While the record contains historical information about the various careers the parties had and the contributions they made to their marriage, to Golight, and to their overall financial success, we see little need to extensively detail that information. It is sufficient to say that both Joyce and Jerry are intelligent, hard-working people who contributed in various and substantial ways to a long-term marriage, to their children, and to the accumulation of a substantial marital estate.

## II. TRIAL COURT DECISION

The trial court's decision began by rejecting Jerry's claim that because the idea for Golight was exclusively his, there should not be an equal division of the marital estate. The court found that the marital estate of the parties should be equally divided. The court accepted McChesney's valuation of $383,614 for Jerry's interest in Gohl Brothers as the only evidence of such value.

As for the valuation of Golight, the court noted that much of the value of Golight resides in its patent, which was confirmed in *Golight v. Wal-Mart, Inc., et al.*, 355 F.3d 1327 (2004), but that such decision was under appeal. The trial court stated in its divorce decree that Renter, Joyce's expert, included in his valuation of Golight's patent one-half of the value of the judgment Wal-Mart had been ordered to pay to Golight—whereas in his valuation report, Renter had actually added $232,000 to "earnings and to accounts receivable in the year 2001" as an adjustment to valuation data derived from Golight's internal financial

statements. However, the base judgment was $464,280, and the federal trial court also awarded Golight both prejudgment and postjudgment interest on such amount, plus costs and attorney fees. Thus, Renter included in his valuation a specific sum in earnings for 2001 from the litigation rather than "[giving] a value of [the patent confirmed in *Golight v. Wal-Mart, Inc., et al., supra,*] as one-half of the award to Golight," as said by the trial court. In contrast, Jerry's expert gave the patent no value, as he had testified that he could not determine a proper way to value such an award. The trial court opined in its decision that the value of the judgment from the U.S. District Court for the District of Colorado was "all or nothing," reasoning that either the value of the patent will be confirmed or it will not be, and if not, then "other large predatory companies such as Wal-Mart will market the same product at a lower price and devalue significantly the value of the patent." This is apparently the trial judge's opinion, as there is no evidence about the effect of a reversal of the judgment upon the prospects of Golight. This is perhaps an appropriate point to note that the founder of and "decisionmaker" at Golight, Jerry, did not testify. Because Jerry did not testify, the record does not contain any assessment by Golight's owner of what a reversal of the judgment would mean for the value of that company, or how loss of patent protection would impact it in the marketplace.

Returning to the trial court's decision, we observe that after setting forth several difficulties it had with Renter's appraisal of Golight, the trial court accepted McChesney's valuation of Golight of $505,283 and found that Jerry "ha[d] control over assets in the amount of [$888,897]" and that "[t]his amount should properly be divided between the parties." The trial court found the gross marital estate, after adding in other property and deducting debts, to be $957,699 and that Joyce was entitled to $478,849 as her share of the marital estate. The trial court then made specific awards of personal property, vehicles, bank accounts, life insurance, and retirement accounts, which we need not detail. The record reveals that 100 percent of Golight shares are in Jerry's name.

The court found that although Joyce was residing in the marital home, that house and the ground upon which it stands were

owned by the Gohl Brothers partnership. Reciting its inability to order the partnership to do anything, the court made an alternative award with respect to such property: If the partnership was willing to transfer the property to Joyce, she could receive it free and clear of any other claim. If not, then Jerry would pay Joyce the additional sum of $87,207—the amount the court found as the value of such property. Later, in ruling on a motion for new trial Joyce filed in response to the divorce decree, the court further ordered that if the partnership did not make such transfer within 30 days of the court's order with respect to Joyce's motion for new trial (which order it entered September 12, 2003), the $87,207 would become immediately due and subject to interest at the legal rate. Our transcript contains a postdecision "consent" of the partnership to the court's proposed transfer.

The trial court found that Joyce had been awarded property with a value of $111,430 and, therefore, ordered an equalizing judgment from Jerry to Joyce in the amount of $367,419 to be made in five equal yearly payments of $73,484, with the first payment being due December 31, 2003. However, in its September 12, 2003, ruling on the motion for new trial, the court found Jerry's argument concerning inadequate cashflow to be persuasive, and thus, a new due date of July 1, 2004, for the first of the five payments was ordered along with four more payments in a like amount due each succeeding July 1.

With respect to the judgment against Wal-Mart, the trial court characterized it as a "contingency that may only be dealt with in the future." Nonetheless, the court awarded Joyce, if the judgment were affirmed, one-half of the value of the judgment less the share "of the other person listed on the patent, costs, and any attorney fees that are contingent upon the success of the Appeal."

With respect to alimony, the trial court rejected Joyce's claim that she needed in excess of $5,450 per month to maintain herself, and it awarded her alimony in the amount of $1,900 per month, commencing August 1, 2003, and payable on the first day of each month thereafter for a period of 13 years.

Jerry appeals, and Joyce cross-appeals. After Jerry filed his appeal, he filed a motion to set a supersedeas bond and Joyce moved for temporary spousal support pending the appeal. The court ordered a supersedeas bond in an amount not less than the

"July 29, 2003, structured settlement payments," with the proviso that Jerry could submit a bank line of credit. With respect to spousal support, the trial court ordered such support in the monthly amount of $1,900 but ordered that such amount was contingent upon compliance with the terms for the transfer of the parties' residence, in which Joyce currently resides, to Joyce pursuant to the terms of the trial court's prior orders in the decree and in the order on the motion for new trial:

> In the event that the requisite steps are not taken pursuant to the orders of this court within the required time-frame, [Joyce] is entitled to spousal support pending appeal in the sum of [$3,000] per month . . . due and owing on the first day of each respective month, beginning August 1, 2003, and continuing . . . until the entry of the judgment on the mandate by any Nebraska appellate court.

## III. ASSIGNMENTS OF ERROR

Jerry assigns that the trial court erred and abused its discretion in ordering only a 5-year payment plan of the money judgment to Joyce, that the court erred in awarding Joyce alimony of $1,900 per month for 13 years, and that the court erred in awarding Joyce temporary alimony in the amount of $1,900 per month pending the appeal.

On cross-appeal, Joyce asserts that the trial court erred in its "overall valuation" of Golight, in particular in disregarding the overseas properties, the failure to recognize Waterfjord House expenses over and above the valuation assigned, and the value of the patents. Second, Joyce claims error in the trial court's failure to award her any "separate part of the Golight . . . 3020 accounts payable."

Additionally, Joyce claims that the trial court erred (1) in failing to recognize the equity of the parties in a residence in McCook, Nebraska; (2) in finding that because the family residence had been transferred to the Gohl Brothers partnership, which is not a party to this action, the court could not transfer title to such property from the partnership to Joyce; (3) in awarding the family residence and 1 acre of land, which award was contrary to the zoning ordinances of Hayes County; and (4) in not deciding how the federal court's attorney fee award to Golight

was to be handled upon the conclusion of Golight's litigation with Wal-Mart.

Jerry's and Joyce's assignments of error lend themselves to consolidation for the purpose of discussion, and we will do so in our opinion where clarity and efficiency are served.

## IV. STANDARD OF REVIEW

Because appeals in domestic relations matters are heard de novo on the record, an appellate court is empowered to enter the order which should have been made as reflected by the record. *Shockley v. Shockley*, 251 Neb. 896, 560 N.W.2d 777 (1997). In our de novo review, we determine whether there has been an abuse of discretion by the trial court with respect to the division of property, the payment of alimony, and attorney fees. See *Davidson v. Davidson*, 254 Neb. 656, 578 N.W.2d 848 (1998).

In conducting de novo review, when evidence is in conflict, an appellate court considers, and may give weight to, the fact that the trial court heard and observed the witnesses and accepted one version of the facts rather than another; this standard applies to the trial court's determination regarding the division of property and alimony. *Reichert v. Reichert*, 246 Neb. 31, 516 N.W.2d 600 (1994).

## V. ANALYSIS

### 1. Valuation of Golight

Golight was formed in June 1993 as a Nebraska corporation to manufacture, distribute, and market a new product—a portable remote-controlled spotlight to be mounted temporarily on a variety of vehicles. Golight's product line has expanded since then, and as earlier detailed, at least through the federal trial court, Golight has been successful in a patent infringement lawsuit against Wal-Mart. Joyce's valuation expert, Renter, valued Golight at $2,041,327, after deduction of outstanding debt. Jerry's valuation expert, McChesney, placed the fair market value of Golight at $505,283. The trial court accepted McChesney's valuation. While neither party objects to the trial court's decision to equally divide the value of Golight, Joyce has raised a number of issues in her cross-appeal concerning the McChesney valuation, which the trial court wholly adopted.

(a) Valuation of Overseas Assets

Joyce's first complaint about the McChesney valuation of Golight is that such valuation excluded any value for the equipment located overseas. Examination of McChesney's evaluation does not reveal a separate asset category of overseas assets or equipment, and the record tells us very little about the nature and extent of the equipment.

We must note that this surprising lack of detail, given the complexity of the case, infects the entire record—an apparent result of time limitations imposed on trial counsel by the court. While the record reveals that the trial started at 8:30 a.m. on June 18, 2003, it also shows that when Jerry's counsel began his evidentiary presentation and inquired of the court about how much time he had, the court informed him, "At 12:10 I walk out the door." In response to our questions during oral argument on appeal, counsel for both parties indicated that they had been under a strict time limit of 2 hours per side, and Jerry's counsel asserted that there was no time for Jerry to testify—thus explaining the curious absence of any testimony from him. Neither party assigns error to how the trial was conducted. Nonetheless, we shall ultimately further discuss this matter.

Returning to the overseas equipment, we note that McChesney initially explained that his first determination was whether the equipment was located in the United States. He indicated that on equipment located in the United States, he added back "one-half of the depreciation that had been claimed on that equipment . . . approximately $62,000 of value." He was then asked whether he treated the "equipment off shore a little bit differently." Answering in the affirmative, McChesney stated:

> I did not adjust it at all, just left it on the books at its book value, whatever it is, less a cost of depreciation that has been written off. I think [that in] one year I looked at[,] it had a remaining value of some $35,000 still on the books, in other words, I just assume that's still a value . . . .

Joyce's brief on cross-appeal quotes the next phrase of McChesney's testimony, where he stated that "it is a vulnerable piece of equipment that's overseas, and does it have any real market value, I don't know, but I assume it does not." From this testimony, Joyce argues that McChesney failed to include any

valuation of the equipment Golight owned overseas. We do not claim to fully comprehend McChesney's testimony that we have quoted. We think McChesney is saying that "the equipment" was included at book value. But, we are uncertain what dollar amount was included for overseas equipment as part of McChesney's final valuation of Golight. His written report does not have a category or a specific value for overseas equipment, and the trial court made no findings in this regard.

Similarly, Renter's written report does not specifically address the overseas equipment or assign a specific value to it that we can discern. Renter testified that the overseas equipment would support a depreciation expense for tax purposes, but that "there's residual value that needs to be valued as well." That said, we find no followup question which would specifically delineate a particular value used by Renter for the overseas equipment, which value would demonstrate that Renter treated the issue differently than McChesney did. In short, both valuation experts apparently testified that the overseas equipment had some value which they included in their valuations, but from their reports and their testimony, we cannot discern a specific dollar figure from either expert for the overseas equipment as part of their overall valuation of Golight. We do note that Golight's banker, Hildebrandt, testified that he did not include any value for the overseas equipment in arriving at his testimony that Golight's collateral exceeded its loans by $315,000, which he said gave Farmers State Bank an acceptable equity position of 30 percent.

It is well known that the party assigning error is obligated to produce a record supporting the assignment of error. See *Durkan v. Vaughan*, 259 Neb. 288, 609 N.W.2d 358 (2000). The bill of exceptions simply does not support the claim that the trial court erred in accepting McChesney's valuation of Golight because he did not include overseas assets.

### (b) Date of McChesney's Report

Joyce complains that while McChesney's report has a cover page dated May 12, 2003, the most current financial figures utilized by McChesney were from Golight's fiscal year ending May 31, 2001. In contrast, Joyce's expert, Renter, utilized more current data by using the fiscal year-end figures from May 31, 2002.

Joyce concludes this argument by asserting, "This adds additional suspicion to the McChesney valuation." Brief for appellee on cross-appeal at 27.

McChesney's valuation of Golight is stale because the body of the report clearly states: "[I]t is our estimate that the fair market value of Golight . . . is [$505,283] as of May 31, 2001." In the testimony from McChesney, the fact that he was testifying about the valuation of Golight before the district court in June 2003 with a report fixing its value as of May 31, 2001—over 2 years earlier—was explored by the following exchange:

[Counsel for Joyce:] When did you first prepare your written report[?]

[McChesney:] The first draft was approximately two years ago in July or August, I guess.

[Counsel for Joyce:] But the one that's entered into evidence is dated May 12th, 2003.

[McChesney:] And May 12th would be the date that I typed that version and got it out of the draft stage.

However, there is no indication from McChesney's testimony that on May 12, 2003, he updated his information or changed his opinion of Golight's value to reflect data from a date other than May 31, 2001. For example, his last year of "Projected Earnings Calculation" is 2001, and the information on his historical balance sheet "For Year Ending May 31" is no more recent than 2001. Golight's fiscal or accounting year ends each May 31. The McChesney report's supporting data uses the years 1997 through 2001, and the report's specific conclusion on value is as of May 31, 2001, as we just referenced. McChesney's report is flawed because by the time of trial, 2 additional fiscal years of Golight would have passed during which significant events occurred.

█ We have discussed the matter of the appropriate date to use in valuing marital assets in a divorce action. See *Walker v. Walker*, 9 Neb. App. 694, 618 N.W.2d 465 (2000). There is no "hard and fast" rule concerning valuation dates so long as the selected date bears a rational relationship to the property to be divided, and the selected date is reviewed for an abuse of discretion. See *id.* at 699, 618 N.W.2d at 470. Here, the trial judge, by his complete adoption of the McChesney report, implicitly selected May 31, 2001, as the valuation date for Golight. Given

that 15 months after that date, but before trial, Golight's patent was upheld and a nearly half-million-dollar judgment plus prejudgment and postjudgment interest and attorney fees was awarded against the nation's largest retailer, Wal-Mart, it is apparent to us that McChesney's valuation date of May 31, 2001, bears no rational relationship to the value of Golight, and the trial court's adoption of a May 31, 2001, valuation therefore constitutes an abuse of discretion. This conclusion alone would warrant reversal of the trial court's decision, but there are other valuation issues which we feel we must address for purposes of the remand, and our examination of those issues further buttresses our conclusion that the trial court erred in adopting the McChesney valuation.

### (c) Valuation of Patents

Joyce also assails the McChesney valuation because of its alleged failure to include the Golight patents in its valuation of Golight. As support, Joyce argues that the trial court did not "use," or explain why it did not use, the federal district court's decision in the patent infringement suit against Wal-Mart, which decision valued the " 'royalty' interests in each unit at [$32]." Brief for appellee on cross-appeal at 28. We further quote from Joyce's brief on cross-appeal: "While we do not argue that this is direct and conclusive evidence of Golight share value, it does demonstrate that the patents of Golight, standing alone, have significant value, value that was not addressed by the trial court." *Id.*

Although Joyce has no complaint about the trial court's award to her of one-half of any final judgment in the federal patent infringement case, she asserts that the patents were not included in the McChesney valuation. There is no citation to the record to point us to any testimony by McChesney that he did or did not include the patents in arriving at his value for Golight. Nonetheless, we note that McChesney's "Adjusting Asset Valuation Summary" contains no specific listing, or valuation, for the patents. And, we quote the following "disclaimer" from McChesney's report:

> We were engaged to perform a valuation for Golight . . .
> with the intent of ascertaining an indication of value. If we

were engaged to perform a more detailed analysis, matters may have come to our attention that could have a material impact on the indication of value contained in this report. *Accordingly, our level of assurance on the indication of value is reduced.*

(Emphasis supplied.)

Despite the foregoing written "disclaimer," McChesney testified that if he had issued an "opinion of value" rather than an "indication of value," his "valuation approaches and . . . conclusions would not be any different." McChesney explained that he uses an indication of value when doing litigation work and that the difference is that in an indication of value, he does not include all of the backup details in his report that "Renter has in his report." Apparently, McChesney believes that for litigation purposes, the presence of "all the backup details" is unnecessary. Such concept is obviously at odds with the written "disclaimer" in McChesney's report quoted above, where he admits that attention to more detailed information could have a "material impact" on his indication of value. Similarly, the lack of detail materially impacts our ability to conduct effective appellate review. In conclusion, while Joyce's argument that McChesney's valuation does not include the Golight patents lacks conclusive support in the record, the "disclaimer" by McChesney lends little overall confidence to McChesney's report and reinforces our earlier conclusion that the trial court's adoption of the McChesney report was an abuse of discretion.

## 2. TREATMENT OF HOME LOCATED IN McCOOK

The McCook house was purchased on March 14, 2002, and deeded to Golight by the seller. The evidence at trial was that the home continues to be owned by Golight. Joyce asserts that the trial court did not properly address the valuation issues surrounding the McCook house. The trial court's decree does not specifically mention the McCook house beyond the statement that Jerry shall pay "the McCook National Bank mortgage on the home located . . . in McCook," although the evidence shows that this property is owned by Golight and, based on the testimony of a tax accountant for Jerry and Joyce, that the purchase money was loaned to Golight. The parties' joint property statement contains

Jerry's valuation of this property at $120,197 and Joyce's valuation of $168,000. However, the joint property statement does not include the McCook house in the valuation of Golight, although it undisputedly is owned by Golight.

The above-mentioned tax accountant for Jerry and Joyce testified with respect to the McCook house. When asked how the purchase of the McCook house was handled, he responded:

> [Tax accountant:] . . . It would have been pretty difficult for a person in a divorce proceeding to acquire a home or acquire a loan. We were looking at it as a convenience deal. We advised [Jerry] that as soon as this thing [sic], it needs to be taken out of the [Golight] corporation. [Golight] shows it as a, does not show it as an asset, they show it as a loan from Jerry . . . .

> [Counsel for Joyce:] And [Golight] is funding the purchase of that house now?

> [Tax accountant:] No. It's on his, it's a payable from [Jerry] to [Golight].

On the joint property statement, Jerry claims the loan on the McCook house in the amount of $118,000 as a marital debt. As we understand Joyce's contention about the McCook house, it is that Jerry is "using" the McCook house twice—as a corporate asset which the court awarded to him via the award of the entirety of Golight, but also as a corporate debt reducing the overall value of Golight itself. Brief for appellee on cross-appeal at 29. The argument continues that because the trial court assigned this debt to Jerry, it should have increased Golight's valuation because the $118,000 debt was also used by McChesney as a corporate debt—however, we cannot be certain how McChesney treated the McCook house.

While the tax accountant for Jerry and Joyce states that the $118,000 debt is a "payable" from Jerry to Golight, two matters are noteworthy. First, McChesney's "Historical Balance Sheets" only go as far as the fiscal year ending May 31, 2001, whereas the purchase of the McCook house occurred long after that. Additionally, a $118,000 payable (the debt for the house purchase, payable by Jerry) owed to Golight would obviously be an asset of Golight, and there is no $118,000 payable from Jerry included in Golight's assets found on McChesney's historical

balance sheet (at page 9 of exhibit 26). Moreover, McChesney's testimony does not mention in any way the McCook house. By the same token, Joyce's valuation expert, Renter, does not specifically mention the McCook house in his testimony; nor does his written evaluation of Golight, exhibit 1, contain any specific reference to the McCook house as an asset, as a debt, or as an account payable from Jerry. Further, Renter does not mention any specific debt to McCook National Bank. However, the parties' property statement shows that such bank holds this mortgage on the home. The Renter report uses broad accounting terminology in its "Historical Balance Sheet Summary," but its valuations extend through the fiscal year ending May 2002. In summary, the evidentiary picture is less than clear about the McCook house, but at least on an inferential basis from the timing of the house purchase and the dates of the valuations in the two reports, the more solid inference is that Renter's valuation of Golight includes the McCook house as an asset and accounts for the debt associated with the house, and that McChesney's valuation does not—remembering that McChesney's valuation date fell before the McCook house was acquired and the associated debt was incurred. Because this cause will be remanded, we do not draw definite conclusions about the McCook house, except that McChesney's report's valuation date of necessity excludes from his calculations the house and the corresponding debt, the purchase and incurring of which were events that took place after the date of the valuation. This fact further reinforces our conclusion that the trial court's adoption of the McChesney report as the valuation of Golight was an abuse of discretion.

### 3. WATERFJORD HOUSE—JOHNSON LAKE

The Waterfjord House, owned entirely by Golight, is an asset to which, according to Joyce, the trial court failed to assign any value "above its stated fair market value." Brief for appellee on cross-appeal at 30. The property was acquired prior to the parties' separation, and Joyce values it at $450,000 and its furnishings and personal property at $150,000. In contrast, Jerry simply states on the joint property statement that all of the Waterfjord House is "[i]ncluded in [the] Golight valuation." Renter valued the Waterfjord House at what had been invested into its purchase

and renovation—$722,605. In McChesney's written valuation of Golight, no specific reference to the Waterfjord House can be found, and McChesney's "Summary Description of [Golight]" in that document makes no mention of the Waterfjord House. Nonetheless, in McChesney's testimony, he disagrees with Renter's valuation of the Waterfjord House and says there is nothing to indicate a value in the neighborhood of $700,000. He testified that the Waterfjord House's "book value" on Golight's corporate books was $240,000 and that its "tax assessed value" was $200,000. He offered no opinion as to the value of the personal property located at the Waterfjord House. McChesney did testify that the Waterfjord House was not showing any profit which would constitute a financial gain to Golight. The trial court addressed the Waterfjord House in its decree as follows:

> The Court has difficulty with . . . Renter's setting off the Waterfjord [House] as a separate entity. It is clear that Waterfjord House is part and parcel of Golight . . . . It is not the place of the Court to question the wisdom of such purchase nor the wisdom of the investment of the funds into Waterfjord House. It is simply part of the [Golight] corporation and its expense cannot be ignored. Due to those factors, and the determination by . . . McChesney that much of the overseas manufacturing equipment has little or no value, the Court finds that . . . McChesney's valuation of Golight is the correct one.

Close examination of Renter's report shows that he simply broke out the value of Golight into two natural components, namely its manufacturing business and its bed-and-breakfast operation at the Waterfjord House, assigned a value to each component, and added the values together to arrive at his total valuation for Golight. When the two components of Golight's operation are considered—a bed and breakfast and the manufacturing and retail sales of apparently useful tools—they could hardly be more different. Thus, assigning a separate value to each, and then combining the two for a total valuation, is not unreasonable and illogical. It should be helpful to a fact finder to understand that the Waterfjord House is a component of Golight's business which negatively impacts its future prospects and, quite likely, its valuation. To the extent that the fact that Renter broke Golight into its

two business components was used by the trial court as a basis to adopt the McChesney report, we disagree with that adoption. Renter's treatment of the two components of Golight is no reason to adopt a written valuation report which conspicuously lacks consideration of the fact that Golight owns a bed and breakfast in which it has admittedly invested over $700,000—and which is not profitable.

However, the evidence is clear that the manufacturing portion of Golight is profitable—after paying Jerry a salary of nearly $40,000 in 2001, providing benefits such as retirement and vehicles, and later providing the house for Jerry in McCook. The banker financing the Golight business, Hildebrandt, agreed with the statement that "Golight has excellent earning potential," but that the Waterfjord House has been a "financial drain." The Waterfjord House, an investment of over $700,000, is obviously a drag on Golight, as the evidence was that in the Waterfjord House's best year, it grossed a mere $16,000. However, McChesney also testified that the Waterfjord House was operating at a loss. While McChesney's oral testimony apparently suggests a book value of $240,000 for the Waterfjord House, his report contains no differentiation between the two components of Golight; nor does it value them separately. Thus, the reader of McChesney's report has little understanding of how McChesney actually treated the Waterfjord House, and again our overall confidence in the McChesney valuation is further reduced. In our view, the failure of the McChesney report to separately analyze the two components of Golight—one profitable and the other an apparent "money pit"—is a serious flaw in the McChesney valuation. The two components of Golight are distinct in many ways, including that the manufacturing portion of Golight has a proven record of earnings and, presumably at least, reasonable future prospects, whereas the Waterfjord House appears to be largely a voracious consumer of Golight's capital—for reasons which the record does not illuminate.

The district court's declaration that it is not the "place of the Court to question the wisdom of [the] purchase [of the Waterfjord House] nor the wisdom of the investment of the funds into Waterfjord House" is inconsistent with the trial court's duty to fairly value and divide the marital estate. In our view, a fact

finder in the instant case must consider whether the expenditures in the Waterfjord House were merely a sham to obscure the true financial status of Golight by artificially and unreasonably inflating its debt load, and thereby obscuring its profitability and valuation. The trial court's declaration, essentially that it was "none of the court's business" what has been done with the Waterfjord House, is incorrect. If the court ignored how and why Jerry has spent hundreds of thousands of dollars on the Waterfjord House, and that expenditure's resulting impact on Golight, then the court has not fulfilled its duty to evaluate and divide the marital estate in a fair and reasonable manner—the ultimate test for determining the appropriateness of the division of property being reasonableness as determined by the facts of each case, *Meints v. Meints*, 258 Neb. 1017, 608 N.W.2d 564 (2000). Given that the Waterfjord House property was purchased prior to the divorce petition's filing, but a sum of approximately $500,000 more was spent in "improvements" to that property by Golight (an entity exclusively controlled by Jerry), the Waterfjord House is the "court's business" in keeping with its duty to arrive at a fair and reasonable property division.

## VI. CONCLUSION

The trial judge's announcement of his impending departure at "12:10" before the owner of Golight had a chance to testify (and be cross-examined), plus the trial court's adoption of the flawed and stale McChesney valuation report, compels us to reverse the trial court's decree, except the dissolution of the marriage itself, and remand for a new trial. (Neither party challenges the finding that the marriage is irretrievably broken. See Neb. Rev. Stat. § 42-372 (Reissue 2004).)

We find ourselves in the position of not having a sufficient record to decide the case on our own, although the law is clear that an appellate court has the power to enter the order which should have been made. See *Shockley v. Shockley*, 251 Neb. 896, 560 N.W.2d 777 (1997). Our review of the record reveals a hurried evidentiary presentation, apparently caused by the trial court's imposition of arbitrary time limitations. Thus, the record is incomplete and inadequate for us to decide the complex issues presented. We cannot finally decide the case after our de novo

review of this record—and feel confident that we have achieved a fair, reasonable, and just result. In this regard, we note that Renter's valuation date is May 31, 2002, over a year before trial.

■ Counsel both agreed at oral argument to this court that they had been operating under severe time limits imposed by the district court. However, neither counsel has assigned the conduct of the trial as error; nor were protective steps taken, such as on-the-record requests for additional time or continuances. Nonetheless, we are dutybound to ensure a fair and reasonable property division, and we have no confidence after an exhaustive review of this record that such a division occurred in the trial court or that we could achieve such on this record. This is an equity case, and we must ensure that the parties have a fair hearing and a reasoned decision, which in our opinion did not occur. Arbitrary time limits can easily become the enemy of justice in our adversarial system. See *Robison v. Madsen*, 246 Neb. 22, 516 N.W.2d 594 (1994) (Supreme Court cautions trial courts against use of stopwatches or other similar limitations on time, saying that such methods of controlling course of trial might well overly restrict presentation of evidence and could prejudice party's right to fully present that party's case). Clearly, trial courts can impose reasonable time constraints on the conduct of trials. See *id*. The time limits apparently imposed here were not reasonable, which fact the record demonstrates. (However, we suggest, if limitations are imposed, that such be done on the record with the court stating the reasons therefor.)

We do not discuss the other matters raised in the appeal and cross-appeal, because our decision makes such unnecessary. See *Grahovac v. Grahovac*, 12 Neb. App. 585, 680 N.W.2d 616 (2004). We remand the matters of property division and alimony to the trial court for a new trial.

AFFIRMED IN PART, AND IN PART REVERSED AND REMANDED FOR A NEW TRIAL.